lished upon the trial were therefore insufficient to constitute a conversion. It is substantially undisputed that the title to the chattel was not to pass until the purchase price was paid, and the defendant, under the circumstances disclosed, acted clearly within his rights. The merits of this controversy seem to be entirely with the defendant, and the judgment for the plaintiff, being without evidence to support it, must be reversed.

Judgment reversed, and new trial ordered, with costs to the appellant to abide the event.

(33 Misc. Rep. 4.)

TRUST & DEPOSIT CO. OF ONONDAGA v. VERITY et al..

(Supreme Court, Special Term, Onondaga County. November, 1900.)

MORTGAGES—INTEREST IN DECEDENT'S ESTATE—EVIDENCE—SUFFICIENCY.

A nephew who had recently become entitled to about $8,000 in an uncle's estate applied for an advance on such share to a firm which advertised to make such advances, and, on receipt of $700, executed papers purporting to sell his share absolutely. The nephew swore that the transaction was a loan, and that he signed the papers without knowing the contents. At the time of the transaction both sides were aware of the value of the nephew's legacy, and prior to the closing of the transaction the attorney for the grantee wrote to the executor of the uncle's estate, saying that the nephew had applied to his clients for the purpose of raising money on his share of the estate. A disinterested witness, who identified the nephew to the grantees in the transaction, stated that. his conversation with them pointed to a loan, and not a purchase, and that at the time when the transaction took place the nephew was drinking considerably. The evidence of the witnesses for the grantees, claiming a sale, was in many respects unsatisfactory. *Held*, that the transaction would be considered a mortgage, and not an absolute sale.

Action by the Trust & Deposit Company of Onondaga, as trustee for the wife and children of William P. Brown, against Townsend Verity and others to have certain assignments to defendants by William P. Brown of his interest in a deceased uncle's estate declared to be collateral security for loans, and not absolute sales. Assignments held to be mortgages.

Hiscock, Doheny, Williams & Cowie, for plaintiff.

James C. De La Mare (Theodore E. Hancock, of counsel), for defendants Verity and Frey.

Morris W. Chase, for defendant Brown.

ANDREWS, J. Wilber M. Brown died in Syracuse on January 27, 1896, leaving an estate that was afterwards inventoried at $132,000. By his will, after certain small legacies, he bequeathed and devised the residue of his property to some 16 nephews and nieces, one of whom was the defendant William Perry Brown. The latter was 53 years old,—a married man, with two children, and at the time a resident of the city of New York. He appears to have been a man of intelligence, but in somewhat reduced circumstances. On the 9th day of June, 1898, Mr. Brown executed an agreement in writing with the defendant Rose Frey by which he contracted to sell and convey to her, in consideration of the payment of $200, all

his right, title, and interest, to the value of $1,200, in the estate of Wilber M. Brown. Thereafter, and on June 16th, the transaction was completed by the execution of the necessary papers. On the 30th day of June, 1898, Mr. Brown executed a further written contract with the defendant Townsend Verity, by which he agreed to sell to the latter all his right, title, and interest in the estate of Wilber M. Brown, deceased, for the sum of $500, and on July 11th the final papers were signed. On the 12th day of May, 1899, Mr. Brown executed a further assignment, for value received, of all his right, title, and interest in the estate, to the plaintiff, who, in its complaint, assumes to hold such property as trustee for his wife and children. Thereafter, and on September 28, 1899, the present action was begun. In it the issue to be determined is whether the defendants bought the interests in the estate assigned to them, respectively, or whether they made a loan to Mr. Brown, and the assignments were merely collateral security to such loan.

The defendants Frey and Verity did not personally appear in the transaction. The negotiations were all had between Mr. Brown, on the one side, and a Miss Forgotston and her personal attorney, on the other. And the testimony of these persons as to what occurred is irreconcilable. Mr. Brown says that in each instance he applied for a loan, that his application was granted, and that the sums paid were received as a loan. The other two witnesses say the transaction was an absolute sale, and was clearly understood so to be. In determining between these respective claims the circumstances and facts known to the parties are of great importance. They cast light upon the question as to which version is reasonable and probable, and as to them there is little dispute. Prior to June 9th, when the Frey contract was executed, a letter had been received from the executor of the W. M. Brown estate stating that Mr. Brown would receive therefrom between $5,000 and $6,000. This was known both to Mr. Brown and to Miss Forgotston and her attorney. Prior to June 16th, the date of the final papers, the attorney had made a thorough investigation. By this investigation the identity of Mr. Brown had been established, and his statements regarding the estate had been verified. By June 11th, the date when the Verity transaction was completed, even fuller information was at hand, including a letter from the executor, stating that the estate had inventoried at $132,000. Of this amount Mr. Brown's share would be over $8,000. If the defendants Verity and Frey are right, therefore, they bought, and Brown sold, his interest in the estate for less than a tenth of its value. The mere fact that such a claim is made casts discredit on the defendants' witnesses. It is improbable. It may still be true, but it suggests, at least, the need of a critical examination of the testimony. This is the more necessary when it is considered that all the negotiations were had between Brown and the defendants' agent, and her and their attorney; that all the papers were drawn by the latter, and signed in his office; that they were all verified and acknowledged before him. A circumstance that attracts attention, although it may have no direct bearing on the credibility of the different witnesses, is the curious lack

of business methods in certain parts of the transactions, that in other respects are certainly not so lacking. While these matters were pending, before the final papers were signed, before the investigations were completed, from day to day small advances were made by Miss Forgotston to Mr. Brown without any security whatever. There are, however, some circumstances that bear more directly on this case. Brown says he obtained a loan. The defendants' witnesses say not only that he did not, but that they were careful to explain that Forgotston & Co. never, under any circumstances, made loans upon legacies. Yet the firm seems to have advertised that it made "advances on chattels in use, legacies, insurance," etc. It is true, as Miss Forgotston says, that advances are not always loans. The language may have meant that chattels in use and legacies would be purchased, but it will, at least, bear the other construction. On May 19, 1898, the attorney wrote to the executor of the W. M. Brown estate that Mr. Brown had applied for the purpose "of raising money on his share of the estate of his uncle." On July 2d a second letter was written by the attorney, stating that Mr. Brown "has applied to a client of mine for more money." These expressions seem more applicable to a loan than to a sale. Early in the course of these transactions the question of Mr. Brown's identity became important. Miss Forgotston says that Mr. Brown told her that some one employed by the firm of Tillotson & Co., who had offices on the same floor, knew him and would identify him. A Mr. Graves, apparently a disinterested witness, says that he was in the employ of Tillotson & Co.; that he knew Mr. Brown, and once went with him into offices, at least near those of Forgotston & Co. He there found Miss Forgotston and a man seated at a table with papers before him, whom he cannot identify. Then ensued a conversation plainly pointing to the conclusion that the transaction was a loan and not a sale. In the Verity transaction, at least, the expenses, including the services of Mr. Verity's attorney and the cost of recording the deed, were paid by Mr. Brown. This fact would seem to indicate a loan, rather than a sale. The great and unusual precautions taken in these transactions, the multiplication of documents, the affidavits, with their statements that a sale had been made, and had been made knowingly and willingly,— all this is suspicious in itself. Such is not the way in which an ordinary sale is made. A claim of some kind inconsistent with the present position of Mrs. Frey and Mr. Verity must have been expected, and was to be guarded against. Overcaution is often, of itself, a mark of fraud. The evidence on behalf of the defendants is not altogether satisfactory. That of Miss Forgotston is so detailed, her recollection of conversations is so minute, that the very details themselves excite criticism. And neither she nor her attorney is able to give, or do give, any satisfactory reason for the inadequacy between the amount received and the property claimed to have been sold. Neither of the defendants personally was present at the trial, and their relations to the transaction do not clearly appear. The various advances before the papers were signed, at least, seem to have been made by Miss Forgotston personally, and at her own risk,

should the transaction not prove satisfactory to the defendants. Under all the circumstances, the suspicion that the persons in reality interested were the witnesses who appeared at the trial cannot be avoided. The evidence of Miss Forgotston as to the inception of the Verity transaction deserves notice. Mr. Brown's share of this estate was worth, as all the parties then believed, over $5,000. Of this, at most, he had parted with $1,200. Yet he came in to sell the balance to Miss Forgotston, or to some one for whom she was acting, and, in answer to her question as to how much he wanted for it, he replied, "I want at least $500 more, if I can get it," or, as she says in another place, "$500, or more if I could get it." Such a reply would be natural if a loan was contemplated. If a sale, it would not. At least, some hint of an attempt to bargain might be expected. Nor is Miss Forgotston's explanation of Mr. Brown's motive altogether credible. He needed, she says, $500 to pay off a mortgage on his mother's house. Yet, day by day, until the transaction was finally closed, he was coming into the office and receiving small sums,—a few dollars at a time.

The defendants urge that the documentary evidence is conclusive in their favor. In the various papers, Mr. Brown repeatedly states that the transactions were sales, and that he intended to and did absolutely part with his entire interest in the property for the consideration which he received. Of course, if he chose, knowingly and consciously, to make such a sale, he had the right to do so, and the court may not intervene; and if, knowingly and consciously, and realizing their import, he signed these various papers, the evidence is strong that such was his intention. But he testifies that they were signed by him without any knowledge of their contents, and without any idea that such an interpretation could be given to them as is placed upon them by the defendants in this action. So far as the deeds are concerned in one transaction, at least, he says that he suggested that the whole agreement should be contained therein; but that he was told by the attorney that this would not be satisfactory to the defendants, for the reason that the papers would be placed upon record, and that it was not wished that their business should be open to general inspection. It appears further, from the evidence of Mr. Graves, that during this very time the habits of Mr. Brown were bad, and that on frequent occasions when he visited the defendants' agent and attorney he had been drinking. This evidence is all contradicted by Miss Forgotston and her attorney, but I am disposed to credit the explanation given by Mr. Brown. In the absence of evidence clearly and fully explaining the transactions, in view of the fact, as before stated, that the business was done with the agent and the attorney of the defendants, the nature of the transactions themselves may fairly be considered in deciding upon the credibility of the several witnesses. These transactions were so inequitable, so unnatural, and so unjust that the court will hesitate long before finding that Mr. Brown consciously and voluntarily assigned some $7,500 worth of property for the $700 received by him. I shall therefore hold that the various papers were executed simply as security for the $200 and the $500 advanced to him by the de-

fendants Frey and Verity, respectively, and that the treasurer of Onondaga county be directed to pay to the defendant Frey the sum of $200, with interest from June 16, 1898, and to the defendant Verity the sum of $500, with interest from July 11, 1898, and that, upon such payment being made, he pay the balance in his hands to the plaintiff. I shall further hold that the plaintiff recover costs of the defendants Frey and Verity. Findings may be prepared, and, if not agreed upon, will be settled by me upon five days' notice.

Ordered accordingly.